COMMONWEALTH OF PUERTO RICO
GENERAL COURT OF LAW
SAN JUAN JUDICIAL CENTER
SUPERIOR DIVISION

| | |
|---|---|
| OLMAR LOPEZ-VIDAL, OLMAR-LOPEZ GOMEZ<br><br>Plaintiffs<br><br>vs.<br><br>VRM PENZINI CAPITAL, LLC; VRM PENZINI FUND I, LLC – RENEWABLE SERIES II; RAFAEL E. ROJO-MONTILLA; CARLOS PENZINI-GRANIER; RODRIGO ZAVALA; JOHN DOE<br><br>Defendants | CASE NO.: ___<br><br>RE:<br>TEMPORARY RESTRAINING ORDER; STATUTORY PRELIMINARY, AND PERMANENT INJUNCTION; VIOLATION OF FIDUCIARY DUTIES UNDER THE SECURITIES ACT; ILLICIT ACTS UNDER THE SECURITIES ACT; DAMAGES |

**Sworn Complaint**

**(*for Temporary Restraining Order and Statutory, Preliminary, and Permanent Injunction*)**

TO THE HONORABLE COURT:

Come now plaintiffs Olmar Lopez-Vidal and Olmar Lopez-Gomez, through undersigned counsel and very respectfully state, allege, and pray:

**Introduction**

This Complaint is about a ham-fisted and illegal attempt to usurp the corporate shares and commercial control that Messrs. Olmar Lopez-Vidal and Olmar Lopez-Gomez have and exercise, respectively, with regard to GFC Holdings, Limited Liability Company ("GFC"), and Biomass Green Fuels, LLC ("Biomass"). The plaintiffs are two Puerto Ricans, who with significant sacrifice and dedication, have developed the most attractive entrepreneurial project in Puerto Rico in the all-important renewable energy industry. Olmar Lopez-Vidal and Olmar Lopez-Gomez have been developing this project since 2008, and Biomass was founded in 2019 as the first entity to transform gasses generated in landfills from the organic decomposition of materials into Renewable Liquified Natural Gas or RLNG. Thus, it is a unique enterprise in Puerto Rico and the Caribbean, with an approximate value of more than $35 million and with expectations of generating many millions more in revenues and tax credits.

It is important to mention that Biomass has a contract with the company that owns the landfill site for a term of 25+10 [years], and the sanitary landfill has a useful life of more than 80 years, one of the few that has such a lifespan in Puerto Rico. Biomass guarantees clients more than 100 years of product, since once a landfill site is closed, it continues to generate landfill gasses for 20 to 30 years more.

In addition to its financial attributes, the business also has significant environmental benefits, since it reduces by 90% the emissions of greenhouse gasses from the landfill. Likewise, the operation produces Renewable Carbon Dioxide (RCO2) for industrial and commercial use, while helping to mitigate the impact of global warming. The processing plant has already been built, using cutting edge or latest model equipment and technology, and, what is even more important, producing RLNG and RCO2 for the first time in the history of Puerto Rico, instead of depending on importing such an important fuel source. In fact, the business is so attractive that in the first ten (10) years of production, sales have been made to important clients, both local as well as international with a presence in Puerto Rico, such as Hewlett Packard, Crowley LNG, Banco Popular de Puerto Rico, IPR Aztrazeneca, Linde Gas, and Fuerza Industrial.

Being aware of the value of the business and its attributes (and blinded by an overriding desire to make money at whatever cost) the defendants have employed a deceitful and bad faith scheme sparing nothing to obtain the ownership and control of GFC and Biomass and toss aside the two principal founders of those companies. As will be explained in detail below, they have done this, among other things, through (i) a series of misrepresentations, (ii) acts that are contrary to the corporate bylaws, and (iii) by making decisions in bad faith and in violation of the fiduciary duties with regard to the GFC and Biomass corporations.

The urgent intervention of the Court is necessary and is hereby invoked to stay and prevent the consummation of one of the most unfair and illicit acts in the corporate history of Puerto Rico. To do this, it is important that a Temporary Restraining Order and a Preliminary Injunction be issued to stay any act of usurpation of the corporate powers of the plaintiffs and thereby maintain the status quo until the disputes between the parties are heard on their merits. Let us explain.

**The Parties**

1. VRM Penzini Fund I, L.L.C. – Renewable Series II ("VRM Penzini") is a private capital investment fund (Private Equity Fund) organized under Act 60 of 2019 in Puerto Rico, which owes the highest fiduciary duty and good faith to its investors or potential investors. This fund is also a minority member of GFC. VRM Penzini is a company organized under the laws of Puerto Rico, having the following address: 322 DE DIEGO AVENUE SUITE 301, SAN JUAN, PR 00920.

2. VRM Penzini Capital, LLC, is an "investment advisor" that manages VRM Penzini Fund I, its business activities, and its corporate acts. It is also subject to the highest fiduciary duty and good faith with regard to its investors or potential investors. VRM Penzini Capital is registered with the Financial Industry Regulatory Authority (FINRA) as an investment advisor and with the following address: 322 DE DIEGO AVENUE SUITE 301, SAN JUAN, PR 00920.

3. Rafael E. Rojo-Montilla is a Managing Partner of VRM Penzini Fund I and as agent of such fund, he is subject to the highest fiduciary duty and good faith with regard to his investors or potential investors. Mr. Rojo also is a "Managing Partner" of VRM Penzini Capital and, on information and belief, he is acting illegally as an "investment advisor representative" without being duly registered to act as such. 10 L.P.R.A. § 861.

4. Carlos Penzini-Granier is a "Managing Partner" of VRM Penzini Fund I and as an agent of that fund is subject to the highest fiduciary duty and good faith to its investors or potential investors. Mr. Penzini also acts as a Member of the Board of Managers of GFC, also subject to a fiduciary duty to GFC. Mr. Penzini also is a "Managing Partner" of VRM Penzini Capital and, on information and belief, is acting illegally as an "r investment advisor presentative" without being duly registered to act as such. 10 L.P.R.A. § 861.

5. Rodrigo Zavala is the Chief Operating Officer of Biomass and as such a fiduciary duty with regard to decision-making to that company and its shareholders. He currently is acting illegally as "Chief Executive Officer" of GFC.

6. John Doe, is any other person(s) or entity(ies) that may have conspired with or assisted the defendants herein in their illegal and illicit scheme to take control of GFC.

7. Mr. Olmar Lopez-Vidal is a businessman, married, and a resident of Guaynabo. He is one of the

principal founders of GFC and Biomass and the CEO of both. His contact information is (787) 637-4375, and his address 544 Calle Aldebarán, San Juan 00920.

8. Mr. Olmar Lopez-Gomez is an engineer, married, and a resident of San Juan. He is also one of the principal founders of GFC and Biomass. His contact information is (787) 633- 4555, and his address is Barrio Monacillos, La Marina, Edf. 976, Segundo Piso, Carr. 19, San Juan, PR 00920. Lopez-Gomez is the father of Lopez-Vidal (together, the "Lopez Group").

## The Facts

### The Origin of GFC and Biomass

9. The idea and vision of creating the GFC and Biomass business was Olmar Lopez-Vidal's, who has specialized training in the transformation of solid waste and renewable gasses and has more than a decade of experience in that niche.

10. Biomass is the company that heads the operations of the transformation of RLNG business.

11. GFC is the parent company of Biomass and operates as a holding company, directing the Biomass business strategy. GFC currently is the sole shareholder of Biomass.

12. The strategic plan for creating and launching the Biomass operations originated and was designed principally by Olmar Lopez-Vidal.

13. Olmar Lopez-Vidal also negotiated the long-term contract with the landfill site that supplies the raw material for the transformation to RLNG and obtained the financing for the project.

14. Likewise, Olmar Lopez-Vidal, along with his team, commissioned the necessary equipment for the project, which is unique in the world, and contracted reputable entities for the installation and implementation of the necessary technology for the project.

15. In short, Olmar Lopez-Vidal was the principal founder and creator of the project, which at present is a reality, having an impressive physical plant with world-class technology, as can be seen in the following photograph.




**The GFC Structure**

16. GFC is a limited liability corporation organized under the laws of Puerto Rico, number 35513.

17. As relevant to this case, its operations are governed by an operating agreement titled "Second Amended and Restated Operating Agreement", as amended ("Operating Agreement"). <u>See</u> **Appendix 1**, which is incorporated into and adopted in the allegations of this Complaint.

18. The amendments that are subsequent to the Operating Agreement are the subject of a dispute between the parties and have been used as a vehicle or instrument by the Defendants to perpetrate their illegal strategy to take control by force of GFC and, by extension, of Biomass.

19. The Operating Agreement was amended on May 22, 2023. <u>See</u> **Appendix 2**, which is incorporated into and adopted in the allegations of this Complaint. This amendment is of dubious validity, as the change was made through deceit of the Lopez Group.

20. In May of 2023, the Lopez Group had veto power on any initiative to amend the Operating Agreement.

21. This is the case, since clause 11.3 of the Operating Agreement provides that any amendment, among other things, should have the approval of the majority of the holders of common shares/units, for which the Lopez Group has full control as owners of 66.5% of the total of outstanding GFC common shares. (As an LLC, GFC issued common units of membership interests"), which we will refer to as "shares" henceforth).

22. The Lopez Group owns 8,977,500 shares of a total of 13,499,500 GFC common shares.

23. In fact, Mr. Lopez-Vidal, is the common shareholder with the largest number of shares, with 4,725,000 shares.

24. Under the illegal May 2023 amendment to the Operating Agreement, that document hereafter may be amended with the (i) "Majority Approval of the Members" and (ii) of the "holders of the Series A Preferred Units then outstanding."

25. "Majority Approval of the Members" is a term defined in the Operating Agreement as follows: "Majority Approval of the Members" means the approval, consent, determination or vote (as the case may be) of the holders of Class A Common Units and Series A Preferred Units which, in the aggregate, represent more than fifty percent (50%) of the then Class A Common Units issued and outstanding and those issuable upon conversion of the Series A Preferred Units ***voting*** as a single class." Emphasis provided.

26. As may be seen in the above, that definition provides that all shareholders (both common and preferred) should make decisions by ***voting*** as a single class.

27. This mandate requires that there be a Managers' Meeting that (i) has been duly called, (ii) is constituted with quorum, and (iii) where voting takes place.

28. As will be explained below, in their illicit scheme to take control of GFC, the Defendants attempted to amend the Operating Agreement in a clear and open violation of the voting mandate.

29. In addition to the common shares, GFC has a structure of preferred shares/units, that are issued to raise operational capital for the company.[1]

30. VRM Penzini Fund I is one of the preferred shareholders, with about a 6% minority position. That position was obtained in April of 2023, when GFC carried out an initiative to raise capital.

31. The GFC preferred shares have certain special attributes as compared to common shares.

32. Particularly, when new preferred shares are issued and acquired, this has the effect of diluting the percentage of common shares in the hands of common shareholders.

33. In contrast to this, preferred shares are not diluted.

[1] At this time, the GFC shareholders, both common and preferred, are parties to a federal suit brought by one of the common shareholders, Mr. Gregory Boyd (the "Federal Suit"). Some shareholders have reached a questionable settlement agreement in that suit with the intervention of VRM Penzini, which is not a party to the suit, but appeared supposedly to try to resolve the disputes, although its true objective is to take control of GFC and Biomass.

**VRM Penzini's Representations**

34. Since late 2022, VRM Penzini has been communicating with Olmar Lopez-Vidal and GFC to invest capital in the company.

35. *Now, with the benefit of being able to examine several communications from VRM Penzini that are on GFC servers and that were being made behind the backs of the Lopez Group and others, we know that many of the representations made by VRM Penzini and its principals, codefendants herein, were untrue and were not made in good faith*. Let us see.

36. On February 9, 2023, VRM Penzini, through VRM Penzini Capital, made an investment proposal for GFC that consisted mainly of two points: (i) a fresh capital investment of $1.5 million and (ii) an offer for GFC shareholders to invest in a private investment fund that VRM Penzini created under Act 60 (formerly Act 185).

37. This offer was made on the letterhead of VRM Penzini Capital, a registered investment advisor and includes advice to third parties not involved in the VRM Penzini, the funds for VRM Penzini investment in GFC, or GFC shareholders in VRM Penzini: "VRM believes that, through its capital investment and relations, together with the proposed executive team, favorable terms can be negotiated to cure defaults with EC Waste and Banco Popular."

38. In that offer, VRM Penzini also indicated that its interest was to reduce and not increase the friction among GFC shareholders ("As new investors, we seek to reduce, not add friction, so that the Company and management can focus on the important tasks at hand"). Emphasis in the original.

39. VRM Penzini also indicated its commitment that Mr. Olmar Lopez-Vidal would continue to be the President and CEO of GFC.

40. Likewise, they requested that Biomass not begin sales operations for RLNG until VRM Penzini examined the necessary steps for all of the shareholders to be able to benefit from a certain "Business Energy Investment Tax Credit" (ITC), available at the federal level.

41. Finally, VRM Penzini requested permission from the GFC Board of Managers to communicate directly with EC Waste (the entity that manages the landfill site that supplies raw material to Biomass) and with

Banco Popular de Puerto Rico (GFC's and Biomass's principal creditor) on specific matters. Such communications would be limited to "confirm their willingness to negotiate better terms to cure all pending defaults and claims under the Company's agreements with them."

42. Further to several additional proposals, on May 16, 2023, VRM Penzini made its last proposal, in which it sought to acquire 100% of the common and preferred shares of GFC. Under that offer, VRM Penzini valued GFC at $20,907,803 million. See **Appendix 3**, which is incorporated into the allegations of this Complaint.

43. This communication was also made on VRM Penzini Capital letterhead, as an investment advisor.

44. Among the GFC assets sought by VRM Penzini were (i) "any cash and federal and local tax credits to be received pursuant to the federal investment tax credit," (ii) "any investment or production tax credits currently authorized or authorized in the future," and (iii) "the rights for the Brugal/Linde project in the Dominican Republic."[2]

45. Under this proposal and advice, GFC shareholders could choose between (i) receiving a cash payment for their shares or (ii) receiving 51% of the payment in cash and the remaining 49% in shares of the new fund created by VRM Penzini (the VRM Penzini Fund I LLC Renewable Series II).

46. Consistent with the above, on May 18, 2023, Mr. Rojo, in representation of VRM Penzini Capital and to induce Mr. Olmar Lopez-Vidal to invest in the VRM Penzini funds, represented that "**16% under our structure** [within the new VRM Penzini fund] is **more valuable than the 19% that you currently have** [within GFC], since under our fund, all investors are treated exactly the same." (Emphasis provided).

47. This action constituted a "recommendation" or "advice" with regard to the offer or acquisition of un valor and constitutes an illegal act under the Securities Act of Puerto Rico, since Mr. Rojo, by information or belief, is not registered to act as an Investment Advisor Representative. 10 LPRA § 861.

48. This illegal act invalidates any subsequent transaction engaged in by the Defendants to acquire GFC shares, whether by cash or through shares in any VRM Penzini investment fund.

[2] The Brugal project in the Dominican República is **not** owned by GFC or Biomass, but rather by another company owned by Mr. Lopez-Vidal, so that he reserves all rights to bring a valid action under the law that such an entity may have against

the defendants herein and/or third parties.

49. Likewise, on that same May 18, 2023, Mr. Penzini, also acting as an Investment Advisor Representative, responded to Mr. Rojo's communication by ratifying the advice or recommendation made to Olmar Lopez-Vidal. Mr. Penzini at no time corrected or clarified Mr. Rojo's expressions to the effect that the investment in the new VRM Penzini fund was "more valuable" than the percentage of GFC shares held by Olmar Lopez-Vidal.

50. Meanwhile, after May 18, 2023, the parties still had not reached an agreement on the VRM Penzini proposal.

51. In fact, on May 30, 2023, by email, Mr. Rojo reiterated the VRM Penzini interest in having Mr. Olmar Lopez-Vidal continue to be a part of GFC management, even if VRM Penzini acquired majority control of GFC.

52. VRM Penzini Capital and its representatives, such as Mr. Rojo and Mr. Penzini, may possibly be exempt from the registration requirement when they directly advise their own investment funds, but not when they are advising and/or inducing third parties to invest in their funds, such as the Plaintiffs.

**Illicit and improper actions of VRM Penzini in obtaining tax credits**

53. Over time, VRM Penzini has performed and continues to perform acts that are contrary to law, good faith, and the highest fiduciary duties required by our legal system and the Securities Act of Puerto Rico.

54. As Investment Advisor and as a private investment fund that issues securities, VRM Penzini Capital and VRM Penzini, respectively, are subject to the strictest fiduciary duties.

55. The regulations that are applicable under the Securities Act of Puerto Rico establish that "All broker-sellers, **issuers**, **investment advisors, investment advisor representatives**, advisors covered under federal law, representatives of advisors covered under federal law, agents or any persons subject to the provisions of Law, **will meet the highest standards of fiduciary duties to their clients and investors**." Regulation 6078, January 19, 2000, Office of the Commissioner of Financial Institutions of Puerto Rico, Section 25.1.

56. Puerto Rico is one (1) of the five (5) jurisdictions in the United States that imposes a strict fiduciary standard, under the *uberrima fides* principle.

57. On May 19, 2023, while VRM Penzini was in the midst of negotiations with the GFC shareholders to acquire 100% of the shares of that company, Mr. Rojo, in representation of VRM Penzini Fund I Renewable Series II and Mr. Rodrigo A. Zavala in representation of Biomass Green Fuels, LLC, submitted a Sworn Statement to the Department of Economic Development and Commerce ("DDEC") applying for the exclusive benefit of VRM Penzini Fund I Renewable Series II as "Investor" certain credits that belong to Biomass as an exempt business. See **Appendix 4**, which is incorporated into the allegations of this Complaint.

58. As a part of this application, approximately $6 to $8 million in tax credits that belong to Biomass as an exempt business could be obtained.

59. That sworn statement is a requirement for submitting a "Certification that an Exempt Business is in the Process of Closing Operations." See Section 6-2 of Regulation 7772, November 9, 2009, of the Department of the Treasury, titled "Regulation to implement the provisions of Section 6 of Act No. 73, May 28, 2008, the Economic Incentives for the Development of Puerto Rico Act."

60. Under Regulation 7772 only the exempt business or an investor "with authorization from the exempt business" may sign and file this certificate.

61. In spite of such a clear mandate, Mr. Rojo and Mr. Zavala executed the Sworn Statement without the express authorization of Biomass or GFC.

62. This sworn statement is false, which constitutes the criminal offense of perjury, since contrary to what was represented by Mr. Rojo and Mr. Zavala, VRM Penzini Fund I Renewable Series II was not authorized to file that certificate.

63. The Lopez Group became aware of this ultra vires and illegal act weeks after it was perpetrated.

64. On September 8, 2023, Mr. Olmar Lopez-Vidal alerted the DDEC of the falsehood of that sworn statement. See **Appendix 5**, which is incorporated into the allegations of this Complaint.

65. This disclosure makes Mr. Olmar Lopez-Vidal a "whistleblower," with the attendant legal protections of that act.

66. On September 12, 2023, VRM Penzini, in a letter signed by Mr. Rojo, attempted unsuccessfully to clarify this matter. See **Appendix 6**, which is incorporated into the allegations of this Complaint.

67. In the letter, VRM Penzini, all along five (5) pages attempted to clarify facts for which a single sentence would suffice. That is to say, a sentence indicating that the acts of Mr. Rojo and Mr. Zavala on May 19, 2023 were authorized by the Board of Managers of GFC. This assertion significantly was not made.

68. VRM Penzini's letter has no assertion to that effect, since the record is clear, and they never had authorization to do what they did.

69. Instead, in a clear move to distract attention, the letter mentions that Mr. Lopez-Vidal knew about the rescue strategy and that the GFC Board of Managers had approved continuing with such effort. To have knowledge of approving a continuation does not make true [sic] the irrefutable fact that Mr. Rojo and Mr. Zavala did not have authorization to make the certification that they made under oath on May 19, 2023, and therefore, they perjured themselves.

70. Worse yet, they did not either have authorization to act in that manner for the exclusive benefit of VRM Penzini, instead of applying for that million-dollar credit for the benefit of Biomass.

71. In fact, VRM Penzini's so-called "rescue strategy" is highly questionable, since GFC's and Biomass's financial position became more complicated precisely due to the VRM Penzini requests.

72. In February of 2023, VRM Penzini brought to the attention of GFC and its shareholders the opportunity of obtaining over $18 million in federal tax credits called the "Business Energy Investment Tax Credit" or ITC. In view of this, VRM Penzini asked Biomass **not** to begin sales operations of RLNG, in spite of the fact that Biomass was ready to start selling the product.

73. This heightened the challenges that Biomass was facing, since for months it was unable to generate liquidity, putting that company in a precarious financial position.

74. VRM Penzini cannot use its own financial scenario that demanded as a condition for investing in GFC to obtain million-dollar tax credits for its sole and entire benefit.

75. Furthermore, Mr. Zavala's acts are highly questionable, since in spite of having been illegally appointed as CEO of GFC, his interests are committed to the VRM Penzini group.

76. In fact, according to documents in Plaintiffs' possession, the VRM Penzini group promised Zavala a share as owner of an entity to be created for selling the RLNG to be produced by Biomass.

77. This entity was to be called Biomass Commercialization or Comercializadora Biomass and Mr. Zavala would be an 8.59% owner of such.

**The illicit and improper acts of VRM Penzini to prevent $4.3 million in capital to reach GFC**

78. On July 17, 2023, the Board of Managers of GFC approved raising capital for the amount of $4.3 million ("Capital Increase") to obtain funds to address the financial and operational needs of GFC.

79. As the principal common shareholder of GFC, each one of the members of as a preemptive right under the Operating Agreement, particularly Section 4 of that document.

80. Availing himself of that right, on August 25, 2023, Mr. Lopez-Vidal submitted to the Board of Managers of GFC a "Management Master Plan," which confirmed Lopez-Vidal's commitment to contribute the $4.3 million for the Capital Increase.

81. That same day, Mr. Penzini, who is part of the GFC Board of Managers advised his partners at VRM Penzini of this commitment: (i) Mr. Rojo; (ii) Mr. Zavala; and (iii) Mr. Diego Rodríguez, among others.

82. In Mr. Penzini's words, he alerted the following: "Here is Olmar's plan. His intention to invest all of the necessary capital, up to $4.3M is set forth in writing."

83. In spite of the good news that that investment commitment meant for GFC and its needs, Mr. Penzini saw it as a threat and immediately advised his group of the need to activate a scheme to prevent such an infusion of funds into the GFC company: "We have to think about the OA amendment and the implication that Olmar could obtain a percentage of the preferred."

84. These statements were made Mr. Penzini's email account at VRM Penzini Capital, the Investment Advisor, in violation of the highest fiduciary duty towards his clients and investors.

85. The Plaintiffs have a copy of that communication since Mr. Penzini copied it to the COO of Biomass, Mr. Rodrigo Zavala.

86. Mr. Zavala, in spite of being a Biomass officer and having a fiduciary duty to that company and its shareholder GFC, made the decision to support a minority group with an illicit plan to acquire the company through misrepresentations and deceit.

87. In fact, Mr. Zavala reported directly to Mr. Lopez-Vidal as CEO of Biomass and never alerted him of the VRM Penzini plan to prevent the contribution of $4.3 million to the operations that company.

88. Mr. Penzini and his associates, including Mr. Rojo, continued to discuss different investment scenarios and concluded that if Mr. Lopez-Vidal invested the $4.3 million it would be "game over" for them: "Correct, if J&W convert and OLV invests $4.3M, it's game over."

89. Therefore, in his overriding desire to control the GFC company, even when it meant preventing the injection of $4.3 million as fresh capital, Mr. Rojo said the following to his group: "If we can change the board, we will have to amend the capital call to $1.5M, if we can get the management to convince to the BPPR of our plans. That way we would avoid all of that."

90. In essence, Mr. Rojo did nothing else but set forth the VRM Penzini plan to take control of GFC by force and against the best interests of GFC itself. To do this it would be necessary: (i) to change the GFC Board of Managers, and (ii) amend the "capital call" of July 17, 2023 to *reduce it* to $1.5 million to benefit VRM Penzini against the best interests of GFC.

**The illicit and improper acts of VRM Penzini to illegally take control of GFC**

91. With this plan in mind, on August 25, 2023, VRM Penzini, helped by several other persons, orchestrated a hostile and illicit takeover of GFC.

92. On that same day, the VRM Penzini group called a meeting of the GFC Board of Managers at Banco Popular facilities, in spite of the fact that Mr. Olmar Lopez-Vidal, CEO of GFC had previously called a meeting of the GFC Board of Managers via Zoom.

93. In spite of the fact that the meeting called by VRM Penzini was not official, VRM Penzini went forward with his plan and attempted to hold the meeting, <u>in spite of not having quorum for such</u>.

94. In fact, the lack of quorum was confirmed by Mr. Rojo himself, who stated the following on August 25, 2023 in an email between the VRM Penzini group and legal counsel: "… the meeting was not held, Olmar did another one of his crazies and canceled the one called by Guillermo [Picó], called another separately and **neither had quorum**. So, we continue to be in limbo." (Emphasis provided).

95. In spite of being fully aware of the lack of quorum and the fact that there was no clear course to follow, the VRM Penzini group forced a hostile and illegal takeover of GFC, implementing the plan that is described below.

96. On August 28, 2023, in a letter under VRM Penzini Capital letterhead (the Investment Advisor) notified the following radical changes: (i) an amendment to the Operating Agreement (as Mr. Penzini had previously mentioned as a step that would be necessary to prevent the $4.3 million capital injection), (ii) the designation of Mr. Rojo as a new member of the GFC Board of Managers (to force the VRM Penzini vision at the expense of the remaining shareholders); (iii) the designation of the attorney Mr. Guillermo Picó –who had facilitated the ill-fated meeting on August 25, 20233 [sic]-- as Secretary of the Board of Managers; and (iv) reducing from two (2) to one (1) the number of seats that the Lopez Group would have on the Board of Managers. <u>See</u> **Appendix 7**, which is incorporated into of this Complaint.

97. All of this was done with the unfettered and improper desire to obtain control of GFC, and not following the guidelines of the Operating Agreement.

98. Specifically, the VRM Penzini group and those that were aligned with its strategy, issued a Second amendment to the Operating Agreement, which was effected with the consent of some of the members of GFC, without a duly called meeting that had quorum. The VRM Penzini Group attempted to implement that amendment on August 25, 2023; a date on which there was no quorum fo*r* that meeting. Not all of the members of the Board of Managers were invited, nor were they advised of this supposed initiative.

99. The aforementioned amendment states that it was executed with the "Majority Approval of the Members" but that is not correct, since as we have previously indicated that term envisages that all of the shareholders (both common and preferred shareholders) make decisions by ***<u>voting</u>*** as a single class.

100. Thus, that mandate requires that there be a meeting of the Board of Managers (i) that is duly called, (ii) constituted with a quorum, and (iii) where voting takes place. But none of these three (3) elements were present to validate the actions taken by VRM Penzini.

101. Even knowing that their acts were contrary to the GFC Operating Agreement, the VRM Penzini Group continued with its plan and attempted to disrupt the $4.3 million Capital Increase with an investment through a Convertible Note and for an amount of less than $1.5 million to thereby prevent Mr. Lopez-Vida from continuing to control GFC.

102. On August 27, 2023, some GFC shareholders, without there being a duly-called meeting, and there being no quorum, signed a supposed "Written Consent" to disrupt the Capital Increase of $4.3 million and allow VRM Penzini to invest an amount of less than $1.5 million through a Convertible Note.

103. This stratagem makes no financial sense for GFC, since it is less attractive than an investor that injects $4.3 million.

104. Also, since it illogically reduces the amount of the capital to be raised, this stratagem allowed VRM Penzini to contribute capital through a Convertible Note, which would only benefit VRM Penzini, and is less convenient and attractive for GFC.

105. In view of the "preemptive rights" of the common shareholders due to the purchase of preferred shares by new investors such as VRM Penzini, the convertible notes provide an alternative means for a new investor to attempt to take control. The legitimacy of this stratagem is highly questionable in this matter, since it prevents a founder and common majority shareholder from injecting a significant amount of $4.3 million in order to give way to a lesser amount, or for a new investor that has an inappropriate plan to inject fewer funds into the company in order to seize control at whatever cost.

**Lack of adequate supervision of the professionals that render services a GFC and Biomass**

106. As part of its plan to take control by force of GFC and Biomass, the Defendants demanded the appointment of Mr. Guillermo Picó as corporate attorney of the companies.

107. The Plaintiffs did not object to that appointment, with the understanding that is was made in good faith and subject to the best interests of GFC and Biomass.

108. However, the Defendants have failed to adequately supervise Mr. Picó or they have given him instructions that exclusively benefit the Defendants and are contrary to the best interests of GFC and Biomass.

109. On August 25, 2023, the famous day on which the Defendants took control by force of GFC, Mr. Olmar Lopez-Vidal, as CEO of GFC and Biomass, instructed Mr. Picó not to attend a meeting at Banco Popular on GFC.

110. Mr. Picó ignored these instructions, alleging that he had emails (apparently from other members of the GFC Board of Managers) asking him to attend.

111. Assuming that this is true, such emails do not represent a formal decision by the duly constituted Board of Managers.

112. Section 6.1(e) of the Operating Agreement provides that "…all decisions to be made by or on behalf of the Company or in respect of the Company's business, capital, assets, funds and liabilities of the Company shall be made solely and exclusively by the Board of Managers; provided that the Board of Managers agree to act in good faith in taking such shares or making such decisions."

113. In other words, decisions that are as important as a meeting with the principal creditor must be made by the Board of Managers (not by a portion or some of its members).

114. Also, these decisions must always be made in good faith in order to be effective, which is something that we now know did not happen, since the shares [sic] of the VRM Penzini group and other shareholders aligned with them had the ulterior motive of ousting without just cause and by questionable means the Lopez Group and other shareholders.

115. Mr. Picó, by omission or improper instructions from a minority group, also lent himself to allow for a Convertible Note that did not have the support or approval of the Board of Directors through a vote, according to the requirement of Majority Approval of the Members, which does not allow for critically important decisions to be made by consent without a vote.

116. This Convertible Note had the sole purpose of exclusively benefiting VRM Penzini in order to be in a position to meet certain terms agreed to by this group to settle the Federal Suit.

117. However, GFC and Biomass have nothing to do with that settlement agreement and thus their decisions do not have to be adapted or fitted to help a minority member at the expense of the majority members.

118. Let us remember that previously the GFC Board of Managers had initiated a Capital Increase of $4.3 million and that Mr. Lopez-Vidal had already stated in writing his intention of putting up that capital.

119. The prudent and sensible thing in such a scenario would be to allow those processes to proceed without interruption, which Mr. Picó did not do, whether by omission or improper instructions.

120. In addition, the Plaintiffs are in possession of emails and digital documents that show that Mr. Picó was aware of sensitive legal issues implicating the Lopez Group and he ignored them or attempted to address them without bringing them to their attention.[3]

121. As if this weren't enough, Mr. Picó, by omission or following improper instructions, erratically handled the matters related to the Capital Increase of $4.3 million with an issue of new units or shares and that was approved on July 17, 2023.

122. That process of raising capital activated the right of first refusal that VRM Penzini had to be the first person to acquire such new units or shares.

123. According to an email dated August 22, 2023 from Mr. Picó to the GFC Board of Managers, the first two (2) steps to be taken on this matter are the following: (i) "The Board of Managers approves the capital raise"; and (ii) "**The VRM Option is triggered immediately upon such approval**, and VRM Penzini has 20 days to consider and notify the Company of its intent to exercise the VRM Option, in whole or in part…" (Emphasis provided).

124. In this case, the approval of the new issue of units or shares in exchange for $4.3 million in capital occurred on July 17, 2023.

125. The VRM Penzini option according to the above explanation made by Mr. Picó, was activated at precisely that time and should have expired on August 6, 2023.

126. In spite of the fact that the VRM Penzini option was activated immediately on July 17, 2023, it was not until fourteen (14) days later, on July 31, 2023, that Mr. Picó sent

[3] The Plaintiffs reserve the right to address these matters in due course in the appropriate venue. For the time being, they are only

mentioned here, since they are part of the scheme implemented by the Defendants.

VRM Penzini a document notifying its option, titled: "Special Option to Purchase Notice and Indication of Interest Form." According to that document and contrary to the advice that Mr. Picó gave the Board of Managers, this document allowed VRM Penzini until August 20, 2023 to exercise its option.

127. This meant that VRM Penzini had a term of thirty-three (33) days in which to exercise its option, which is incorrect and should have no effect.

128. In spite of this undue advantage, VRM Penzini failed to exercise its option correctly, since it did not sign in an unadulterated manner the notification that GFC, through Mr. Picó, sent it.

129. In particular, VRM Penzini, disagreeing with the notification that was delivered to it, struck out portions of the notification and accepted the option subject to that modification. See **Appendix 8**, which is incorporated into the allegations of this Complaint.

130. Unfortunately, VRM Penzini only had two (2) choices: (i) to exercise the option and indicate the number of shares that it would acquire; or (ii) to decline the option.

131. VRM Penzini did not have the right, as it attempted to do, to renegotiate the terms of the option by modifying its content.

132. This action invalidated the option and made it ineffective.

133. Mr. Picó should have alerted the GFC Board of Managers of this gross deviation, but he failed to do so.

134. In fact, the GFC CEO, Mr. Olmar Lopez-Vidal, sent three (3) emails to Mr. Picó from August 23, 2023 on in which he asked several questions about the VRM Penzini option and certain preferred rights that would be activated with that option, and Mr. Picó did not respond to any of those messages.

135. What would have been correct and prudent was for Mr. Picó to respond to the questions posed by the GFC CEO, particularly when the process that went forward deviated from the advice given by Mr. Picó himself.

136. During the past weeks, the Plaintiffs have unsuccessfully attempted to stay the illicit conduct of the defendants through legal communications. Only the intervention of this Court may undo this conduct.

**Causes of Action**[4]

**First Cause of Action for Statutory Injunction under the Corporations Act**

137. All of the previous allegations are hereby incorporated and adopted.

138. The Corporations Act of Puerto Rico seeks to simplify and facilitate the procedures related to corporate governance.

139. To that effect, Section 7.15 provides a mechanism for the resolution of disputes regarding the removal of directors or managers of a corporate board. 14 LPRA § 3655.

140. Any shareholder may bring a cause of action under that Section. *Canellas Fidalgo v. Party City of PR, Inc.*, No. SJ2016CV000001 (907), 2017 WL 1953320, at p. *5 (Court of Appeals, March 23, 2017).

141. Under that Section the courts "are empowered to issue a statutory injunction in regard to an alleged illegitimate removal of a director." Ibid.

142. The movant for such a statutory injunction need not establish the elements of a classic injunction, such as the requirement of irreparable harm. See *Canellas Fidalgo*, 2017WL 1953320, at p. *1; *Joglar Castillo v. Advanced Wirelesss Commc'ns, Inc.*, No. KLAN201800645, 2020 WL 1486931, at p. *13 (Court of Appeals, Feb. 28, 2020).

143. In this case, the two (2) positions held by Messrs. Olmar Lopez-Vidal and Olmar Lopez-Gomez were eliminated to consolidate them into a single position.

144. The position of Preferred Manager was also created, and given to Mr. Rojo, who has committed serious acts against the best interests of GFC and to the benefit of his investment fund under VRM Penzini.

145. This decision was made in an act contrary to the Operating Agreement, which required the vote of the majority of the managers in a duly called meeting with quorun, something that clearly did not happen.

146. Also, subparagraph "b" of Section 3655 provides a cause of action to judge and determine the result of any vote by shareholders or members.

147. On July 17, 2023, the GFC Board of Managers approved raising capital in the amount of $4.3 million to obtain funds to address the financial and operational needs of GFC.

[4] The plaintiffs reserve the right to bring a derivative action in due course to assert other rights of GFC and Biomass of which they have been deprived by the conduct of the defendants and others.

148. The Defendants attempted to modify that corporate mandate, which had been made by majority vote of a duly constituted Board of Managers meeting, through written consent that does not follow the guidelines of the Operating Agreement.

149. This act is also contrary to the express provisions of the Operating Agreement and this Honorable Court has full power to prevent such action that is contrary to law.

**Second Cause of for a Temporary Restraining Order, Preliminary and Permanent Injunction**

150. All of the previous allegations are hereby incorporated and adopted.

151. As discussed in more detail in the Request for a Temporary Restraining Order and Preliminary Injunction filed along with this complaint, in this case there are sufficient grounds for the Honorable Court to immediately issue an Order to stay any stratagem of the Defendants to take control of GFC and Biomass and influence decision-making at those companies.

**Third Cause of Action for Declaratory Judgment**

152. All of the previous allegations are hereby incorporated and adopted.

153. The Rules of Civil Procedure provide that "The Court of First Instance shall have the power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a resolution or declaratory judgment is sought…" See Rule 59.1 of the Rules of Civil Procedure of Puerto Rico, 32 L.P.R.A. App. V, R. 59.1.

154. Likewise, "Any person interested under […] a written contract, or other documents that constitute a contract, or whose rights, status or other legal relations are affected by […] a contract, may request a determination on any discrepancy in the interpretation of such […] contracts.

155. Likewise, Mr. Lopez-Vidal was unduly removed form his position as President and CEO of GFC, so that he should be reinstated as such.

156. We ask the Honorable Court to rule that he is the true President and CEO of GFC and Biomass.

157. The Lopez Group also has a right to two seats on the Board of Managers, which were usurped by the questionable actions of the Defendants.

158. We ask the Honorable Court to rule that the Plaintiffs have the right to continue to hold the two seats they had on the GFC Board of Managers.

159. We further ask that the Honorable Court declare that the position of Independent Administrator, which was held by Ms. Raquel Cortez, be restored to its original state. Ms. Cortez submitted her resignation once the defendants set in motion the improper plan discussed herein.

160. We likewise ask that the Honorable Court declare that the Option exercised VRM Penzini on August 19, 2023 has no legal effect whatsoever, as it is conditioned and is not within the bounds of the options to which VRM Penzini was entitled.

**Fourth Cause of Action: Violation of Fiduciary Duties**

161. All of the previous allegations are hereby incorporated and adopted.

162. The Securities Act of Puerto Rico requires that Investment Advisors, such as VRM Penzini Capital perform the highest fiduciary duty towards investors such as the Plaintiffs.

163. The Securities Act of Puerto Rico also requires that Investment Advisor Representatives, such as Messrs. Rojo and Penzini, perform this same strict fiduciary duty.

164. The Corporations Act also requires the performance of fiduciary duties by the Directors and Officers of a company so that they also perform their functions appropriately and without any ulterior motive with regard to the company.

165. The Defendants VRM Penzini Capital, Rojo and Penzini violated their respective fiduciary duties with regard to the Plaintiffs.

166. Among other things, the Defendants seek to benefit from tax credits that belong to Biomass.

167. For that purpose, they made misrepresentations to instrumentalities of the Government of Puerto Rico.

168. Likewise, the Defendants, favoring their own interests above those of GFC and Biomass, have carried out several actions to prevent the corporations from receiving a capital injection of $4.3 million, as had been duly approved by the Board of Managers.

169. The Defendants also violated their fiduciary duties towards GFC and Biomass by failing to supervise Mr. Picó's work or instructing him to perform actions against the best interests of those companies.

**Fifth Cause of Action of nullity due to illegal advice**

170. All of the previous allegations are hereby incorporated and adopted.

171. Messrs. Rojo and Penzini acted as representatives of VRM Penzini Capital and provided the Defendants with advice to induce them to make their decision to invest in the VRM Penzini funds.

172. In particular and among other things, Rojo and Penzini advised Lopez-Vidal regarding the higher value that his investment in the VRM Penzini funds would have as compared to the value of the current percentage that Lopez-Vidal has in GFC.

173. They also advised him regarding other virtues or advantages of associating or investing with n VRM Penzini and how that investment decision would be fruitful.

174. By information and belief, Penzini and Rojo are not registered as Investment Advisor Representatives, as required by the Securities Act.

175. This conduct is contrary to law and an illegal act, as expressly set forth statutorily in the Securities Act of Puerto Rico.

176. All subsequent acts derived from such illicit act are equally invalid and null.

**Sixth Cause of Action for misrepresentations in the offering or sale of securities**

177. All of the previous allegations are hereby incorporated and adopted.

178. The Defendants engaged in several misrepresentations, leading the Plaintiffs to believe that they would continue to be a part of the GFC and Biomass senior management, which turned out to be untrue.

179. These misrepresentations were made with the intention of inducing the Plaintiffs to divest from their interests in GFC and Biomass so that the Defendants could deprive them of such positions.

180. The Plaintiffs relied on such representations in good faith and openly negotiated with the Defendants.

181. The Plaintiffs have suffered severe damages due to the tortious conduct of the Defendants, which are hereby claimed and estimated at an amount of no less than $10,000,000 million.

**Seventh Cause of Action for Damages**

182. All of the previous allegations are hereby incorporated and adopted.

183. In our legal system the doctrine of the prudent man is paramount, for which all persons have the obligation to follow the standards of fair dealing and good faith, exercising the degree of diligence and care that the situation may require.

184. The Defendants failed to perform such duty of care, because their acts that are contrary to law and the bad faith planned and engaged in by them, as set forth in this Complaint.

185. Therefore, they are jointly and severally liable for all harm caused to the Plaintiffs.

**Eighth Cause of Action for violation of the doctrine of good faith**

186. All of the previous allegations are hereby incorporated and adopted.

187. The concept of good faith, which imbues our entire legal system, is of such importance that it was recently given statutory form in the 2020 Civil Code.

188. Thus, Section 15 provides that "rights shall be exercised and duties complied with as demanded by good faith." 31 LPRA sec. 5334

189. Also, Section 18 states that "the law does not harbor abuses of rights or the exercise of rights in a manner contrary to the social order. All acts and omissions that patently exceed the normal limits of the exercise of a right and that cause damage to a third party, whether due to the intention of the author thereof or the purpose or the circumstances in which they are carried out will give rise to appropriate compensation and injunctive relief." 31 LPRA sec. 5336

190. Furthermore, the new 2020 Civil Code defines and classifies what is considered a "legal act" with particular attention to those who engage in or carry out such acts, regardless of whether there is a contractual relationship. Section 264, 31 LPRA sec. 6112, defines Legal Act as follows: "If the legal act takes place due to the action of one or more persons it is called a legal act. Legal acts may be voluntary or involuntary. Acts that are embodied and carried out with judgment, intent, and freedom are voluntary. Acts that do not have such characteristics are involuntary."

191. Thus, "voluntary and involuntary legal actions and acts produce the effects that are attributed to them by law." Section 265, 31 LPRA sec. 6113.

192. Thus, there is no question that the conduct and long list of improper acts of the Defendants are

abhorrent to our legal system and give rise to an additional claim against them.

193. The defendants are liable for all of the consequences and harm arising from these acts of bad faith.

194. Current law in Puerto Rico recognizes a broad construction of the doctrine of clean hands and good faith, as ruled by the Supreme Court of Puerto Rico forty years ago in International General Electric v. Concrete Builders, Inc., 104 DPR 871 (1976).

195. The doctrine allows a party to claim damages when it is established that there was an "attack on the good faith [of the claimant]," even absent a contractual relationship between the parties. Ibid., p. 877.

196. The doctrine is flexible and affords the courts a "broad margin of free action," by allowing the courts to apply the doctrine by adapting it to the circumstances as required by equity. Luis Díez-Picazo Ponce de Leon, La Doctrina de los Actos Propios: Un Estudio Crítico Sobre la Jurisprudencia del Tribunal Supremo, 74 (Civitas Thomson Reuters (Legal) ed., 2nd ed. 2014) (hereinafter Díez-Picazo, Doctrina de Actos Propios).

In Guaynabo, Puerto Rico, this 20th day of September 2023.

**VICENTE LAW, LLC**

P.O. Box 11609
San Juan, PR 00910-1609
Telephone (787) 751-8000
Fax (787) 756-5250

*s/ Harold D. Vicente*
**HAROLD D. VICENTE**
TS- 3966
E-Mail: *hvicente@vclawpr.com*

**H. LOPEZ LAW, LLC**

Metro Office Park
Street 1, Building 11, Suite 105A Guaynabo,
Puerto Rico 00968
Telephone: (787) 422-0243
www.hlopezlaw.com

*s/ Heriberto Lopez Guzmán* **Heriberto Lopez Guzmán**
TS- 16,166
hlopez@hlopezlaw.com

SJ CV2023 08898 9/20/2023 3:58:40pm DOCKET NUM. 1

**Anne Catesby Jones, MA**
**Translator/Traductora**
19 B Caleta de las Monjas, San Juan, P.R. 00901
Tel. 787-725-1379 Mobile: 787-930-3834 e-mail: annecatesby@gmail.com

October 3, 2023

TO WHOM IT MAY CONCERN:

I have translated the above 24 pages of the Sworn Complaint by Omar Lóez et al. v. VRM Capital et al. from Spanish to English, to the best of my ability and I certify that the translation is true and correct.

American Translators Association
ata
Anne Catesby Jones
English into Spanish
Certification #5084
Certified Translator

Verify at www.atanet.org/verify

Anne Catesby Jones
ATA #2537