**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| GREGORY BOYD, et al., | |
| Plaintiffs, | |
| v. | **Civil No. 22-1190 (GMM)** |
| OLMAR LÓPEZ-VIDAL, et al., | |
| Defendants. | |

<u>**OPINION AND ORDER**</u>

Pending before the Court are several motions: *George Economou, Lidiana Rodriquez, their Conjugal Partnership Economou-Rodríguez and CB Solutions PR Corp. Motion to Dismiss* ("Economou Motion") at Docket No. 654; *Motion to Dismiss the Second Amendment Complaint Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)* ("Borschow/Semillero Motion") at Docket No. 657; *Motion to Dismiss and Joinder* ("Motion for Joinder") at Docket No. 658 joining in the arguments of the *Borschow/Semillero Motion*; *Banco Popular de Puerto Rico and Joval Rodríguez, Stephanie Cummings, and their Conjugal Partnership's Motion to Dismiss the Second Amended Complaint (DKT. 147)* ("BPPR/Rodríguez Motion") at Docket No. 652; *Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Procedure* ("Acosta Motion") at Docket No. 655; *Motion to Dismiss for Failure to State a Claim* ("CDVCA/PRFG Motion") at Docket No. 651; and *Motion to Dismiss Plaintiffs' Derivative Claim*

**2 | Civil No. 22-1190 (GMM)**

*(Count Six of Second Amended Complaint) and Incorporated Memorandum of Law* ("BGF/GFC Motion") at Docket No. 659 (collectively, "*Motions to Dismiss*").

For the following reasons, the Court hereby **GRANTS** the *Motions to Dismiss*.

## I.   INTRODUCTION

This case arises from a failed effort to construct a landfill-gas-to-energy biorefinery in Humacao, Puerto Rico. Plaintiffs Gregory Boyd ("Boyd") and Jonathan Lassers ("Lassers") (collectively, "Plaintiffs") were equity holders in entities formed to develop the project and now bring this action asserting federal and Puerto Rico law claims against former business partners, lenders, and investors associated with the venture.

The *Second Amended Complaint* recounts a lengthy and complex series of business disputes concerning the project's financing, construction, and management. Plaintiffs allege that certain Defendants misused project funds, concealed financial information from investors, and engaged in self-dealing transactions that ultimately caused the project to fail.

Although the allegations describe serious business disputes, the Court's role at this stage is a limited one. The question before the Court is not whether Plaintiffs have described troubling conduct, but whether the claims as pled, viewed in the most favorable light, provide a viable basis for federal jurisdiction.

3 | Civil No. 22-1190 (GMM)

As explained below, they do not. Plaintiffs' federal claims fail as a matter of law. The Court therefore declines to exercise supplemental jurisdiction over the remaining Puerto Rico law claims.

## II.   RELEVANT PROCEDURAL HISTORY

Plaintiffs filed the first *Complaint* on April 25, 2022, individually and derivatively. (Docket No. 1). Plaintiffs moved shortly thereafter for a temporary restraining order ("TRO") to enjoin Olmar López-Vidal ("López-Vidal") and Olmar López-Gómez ("López-Gómez," and collectively with López-Vidal, "the Lópezes") from liquidating GFC Holdings, LLC's ("GFC") and Biomass Green Fuels, LLC's ("BGF") funds, (Docket No. 31), which was referred to Magistrate Judge Bruce J. McGiverin ("Magistrate Judge McGiverin"). (Docket No. 45). Magistrate Judge McGiverin recommended denying the TRO, which Plaintiffs acquiesced to. (Docket Nos. 74, 82, 96).

In the interim, much procedural wrangling passed between the parties. This includes requests for contempt and sanctions, among other matters. (Docket Nos. 295-96, 304, 398, 526, 590). Two other versions of the complaint were also filed during this time.[1] The *Second Amended Complaint* – the operative complaint - was filed on January 23, 2023. (Docket No. 147). This is Plaintiffs' third

---

[1] Alongside this case, two other cases were filed and have since been either remanded or dismissed: 23-CV-01360-RAM and 23-CV-1569-PAD.

**4 | Civil No. 22-1190 (GMM)**

iteration of their complaint, filed with the benefit of prior judicial guidance regarding pleading deficiencies. Since, Plaintiffs and Defendants also attempted mediation. (Docket No. 159). Five sessions were held. (Docket No. 248). Mediation failed. (Docket Nos. 427, 517).

All Defendants filed motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Discovery commenced on February 12, 2025, but was stayed pending these mounting *Motions to Dismiss*. (Docket Nos. 593, 641). In early July 2025, Plaintiffs notified the Court that the López family[2] and their associates settled; their claims against those Defendants have thus been dismissed. *See* (Docket Nos. 701, 712, 720).

Only the following motions remain: (1) *Borschow/Semillero Motion*; (2) the *Motion for Joinder*; (3) the *Economou Motion*; (4) the *Acosta Motion*; (5) the *BPPR/Rodríguez* Motion; (6) the *CDVCA/PRFG Motion*; and (7) the *BGF/GFC* Motion.[3]

---

[2] The Lópezes and Carlos López-Vidal ("Carlos López"), along with their wives, were defendants. *See* (Docket No. 147 ¶¶ 9-10, 12). The Lópezes were owner of several affiliated entities that were also defendants in this case, some of which include: International Technical Services Inc. (Puerto Rico); International Technical Services Inc. (Delaware); International Technical Services Corp. of Puerto Rico; I.T.S. Corporation (Puerto Rico) and International Technical Service (Dominican Republic) (collectively, "ITS"); and Distributed Power Innovators JV/ITS-ASC Construction JV (the "ITS/ASC JV"), which contracted to build BGF's facility at the El Coquí Landfill. (Id. ¶¶ 9, 17-19).

[3] For purposes of discussing these motions with respect to Plaintiffs' RICO claims, defendants other than BGF/GFC will at times be referred to as "the RICO Defendants."

**5 | Civil No. 22-1190 (GMM)**

### III.    FACTUAL BACKGROUND

Because the pending motions raise threshold jurisdictional issues, the Court recounts only those allegations necessary to place the claims in context. The following summary is drawn from the *Second Amended Complaint*. The Court notes that these allegations reflect Plaintiffs' characterization of a complex and heavily disputed business relationship and are recited solely and accepted as true solely for purposes of resolving the *Motions to Dismiss*.

### A.    The Parties and Project Entities

Plaintiffs were equity holders of GFC and BGF,[4] (Docket No. 147 ¶¶ 6-8), entities created to develop a landfill-gas-to-energy facility in Humacao, Puerto Rico. BGF was formed to develop a facility designed to capture methane generated by landfill waste and convert it into renewable, commercially usable carbon dioxide and other energy products.[5] (Id. ¶¶ 33-40).

The *Second Amended Complaint* names numerous Defendants, including members of the López family, former business partners, project managers, corporate officers, financial institutions

---

[4] GFC and BGF are limited liability companies organized under the laws of Puerto Rico and nominal Defendants in this action. (Docket No. 147 ¶¶ 25-26).

[5] BGF is wholly owned and managed by GFC. (Docket No. 147 ¶ 27). Thus, both companies are collectively referred to in this opinion as "BGF/GFC." BGF and GFC have overlapping governances. BGF's common owners include Plaintiffs Boyd and Lassers, as well as López-Gomez, López-Vidal, and John Dumas. (Id. ¶27). GFC and BGF's boards appear to consist of López-Vidal, Economou, and representatives from Semillero, CDVCA, and PRFG. *See* (id. ¶¶ 14, 200, 222, 234, 238). Plaintiffs Boyd and Lassers are common interest holders and were not serving as Board members at the time of this complaint. *See* (id. ¶¶ 755, 772).

6 | Civil No. 22-1190 (GMM)

involved in financing the project, and investment entities that acquired preferred interests in the project companies.

The remaining defendants include BGF's Chief Financial Officer George Economou ("Economou") (id. ¶ 15); board member Alexander Borschow ("Borschow") (id. ¶ 14); BGF's bank and lender Banco Popular de Puerto Rico ("Banco Popular") and one of its account managers, Joval Rodríguez Barnes ("Rodríguez") (id. ¶ 16)[6]; Robert A. Acosta ("Acosta") and the construction companies BGF worked with; and several investment entities that held preferred interests in GFC or BGF, including Semillero Partners ("Semillero"), the Puerto Rico Fund for Growth ("PRFG"), and the Community Development Venture Capital Alliance ("CDVCA"). (Id. ¶¶ 21–24).

B.   **Financing of the Project**

To finance construction of the facility, BGF entered into a credit agreement with Banco Popular for $11.8 million. (Id. ¶¶ 68–69). Boyd, López-Vidal, and López-Gómez each provided a personal guarantee for the Credit Agreement. (Id. ¶¶ 68, 70). This agreement had numerous amendments. (Id. ¶¶ 47–48, 116–18, 615–16). Additional capital was obtained through the federal New Markets Tax Credit ("NMTC") program, which provides tax incentives intended to encourage investment in projects located in

---

[6] Economou, Borschow, and Rodríguez's spouses and their respective conjugal partnerships are also sued and remain as Defendants.

7 | Civil No. 22-1190 (GMM)

economically distressed communities. (Id. ¶¶ 71, 74). Banco Popular acted as lender and disbursing agent for portions of the NMTC financing. (Id. ¶ 71).

Under the relevant financing agreements, loan proceeds were to be disbursed upon submission of drawdown requests certifying the progress of construction and confirming that the requested funds would be used for project-related purposes. (Id. ¶¶ 77-78, 81, 97-102). Plaintiffs allege that the project experienced significant delays and defaults, yet the financing agreements were repeatedly amended and extended, allegedly via the direct or indirect support of the Lópezes, Banco Popular, Rodríguez, and Economou. (Id. ¶¶ 41-51, 96, 116-18, 194, 213, 593, 604, 606).

Plaintiffs allege that Banco Popular had nefarious reasons for issuing these amendments without following terms precisely: they contend Banco Popular sought to secure a long-term supply of renewable natural gas for its facilities at below-market rates. (Id. ¶¶ 96, 480, 646-47). Simultaneously, Plaintiffs also allege that Banco Popular worked alongside the other Defendants to "decrease the value of BGF" its own financial gain. (Id. ¶ 239).

C.   Alleged Use of Project Funds

Plaintiffs allege that, while the project remained incomplete, several Defendants engaged in a pattern of misconduct involving the misuse of loan proceeds and project funds. Allegations include that certain project managers and corporate

**8 | Civil No. 22-1190 (GMM)**

officers approved drawdown requests that misrepresented the status of construction or the purposes for which funds were requested. (Id. ¶¶ 10-13, 82, 96, 110, 392-93, 415-28, 480, 646-47).[7]

According to the *Second Amended Complaint*, some project funds were diverted to pay affiliated companies, finance unrelated ventures, and cover personal or corporate expenses unrelated to the biorefinery project. Plaintiffs further allege that misleading financial information was provided to investors, lenders, and auditors to conceal these activities and continue obtaining disbursements under the loan agreements. (Id. ¶¶ 2, 33-34, 82, 96-103, 106-07, 195-98, 211-12, 326-28, 336-42, 491-97, 556-58).

**D.   Corporate Governance Disputes**

The *Second Amended Complaint* also describes disputes among the project's principals concerning corporate governance and control of the project entities. These disputes escalated as the project faltered. Plaintiffs allege that certain Defendants engaged in self-dealing, manipulated corporate governance procedures,[8] and excluded Boyd from management roles after

---

[7] The Lópezes and Economou allegedly collaborated to submit drawdown certificates to Banco Popular and shareholders to justify loan disbursements which did not accurately reflect the status of the project, the expenses involved, or where the funds went. (Docket No. 147 ¶ 254). Acosta is alleged to have submitted false receipts on behalf of ITS/ASC JV. (Id. ¶¶ 129-32, 190, 199, 336-42).

[8] Borschow is alleged to have breached his corporate duties to BGF/GFC. (Docket No. 147 at 5, ¶¶ 61-65, 160-61, 265-74, 357-81, 385-91, 429-32, 544-47, 550-52, 725-29). Semillero, CDVCA, and PRFG are alleged to have allowed GFC's Operating Agreement to be amended to loosen conflict-of-interest controls, enabling the Lópezes to divert funds. (Id. ¶¶ 65, 359-60, 371-72, 544-47). Economou is alleged to have facilitated the Lópezes' self-dealing of NMTC and

**9 | Civil No. 22-1190 (GMM)**

acquiring a portion of his ownership interest through a Membership Interest Purchase Agreement ("MIPA"),[9] and limited Plaintiffs' access to financial information about the project. According to Plaintiffs, these actions deprived them of oversight over the companies' finances and facilitated the alleged diversion of corporate assets. (Id. ¶¶ 82, 108-10, 117-78, 195-98, 211-12, 326, 328, 415-17, 711-17).

## IV.    LEGAL STANDARD

Federal courts are courts of limited jurisdiction. Their authority, therefore, must be interpreted strictly. Destek Grp. v. State of N.H. Pub. Utils. Comm'n, 318 F.3d 32, 38 (1st Cir. 2003). The party invoking federal jurisdiction bears the responsibility of proving that jurisdiction exists. Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998).

---

BGF funds and hid it from auditors, enriching himself in the process. (Id. ¶¶ 252-56, 275-77, 289-90, 282-88, 289-316, 324-25, 375-90, 491-97, 501, 718, 734-40).

[9] In September 2020, López-Vidal agreed to buy a percentage of Boyd's participation personally through the MIPA. (Docket No. 147 ¶¶ 165, 168-78, 189-93). Boyd sold López-Vidal 7.5% of his interest in GFC and was paid for this sale. (Id. ¶ 170). Allegedly, López-Vidal used BGF's NMTC funds to purchase Boyd's interest. (Id.). During the transaction, the Lópezes allegedly threatened Boyd with litigation regarding the loans Boyd had undertaken on behalf of BGF; they also allegedly promised Boyd a paid Board position as Chief Operating Officer ("COO"). (Id. ¶¶ 173-75, 182, 185, 770). Boyd was not given the COO position; nonetheless, Boyd continued to work on behalf of BGF and GFC in the role of New Business and Development Director. (Id. ¶ 188). Plaintiffs aver the Lópezes' denial of these promises, with Economou's support, amounts to securities fraud. The *Second Amended Complaint* also alleges that "the Lópezes' falsified documentation, threats of litigation, and fraudulent payment for the MIPA with loan money designated for the biorefinery also caused the negation of Lassers' rights to ownership under his SAFE note agreement with BGF as part of the MIPA agreement." (Id. ¶ 178).

**10 | Civil No. 22-1190 (GMM)**

When reviewing Rule 12(b)(6) motions, a two-step plausibility framework articulated by the Supreme Court is applied. *See* Fed. R. Civ. P. 12(b)(6); Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). The first step requires this Court to disregard statements in the complaint that amount to legal conclusions, labels, or formulaic recitations of elements. Schatz, 669 F.3d at 55. Although a plaintiff need not include extensive factual detail, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The Court is not required to infer or construct legal theories that Plaintiffs themselves have not adequately developed, nor to credit conclusory assertions couched as factual allegations. *See* id.

At the second step, the Court accepts the non-conclusory, well-pleaded factual allegations as true, draws all reasonable inferences in the plaintiff's favor, and determines whether those facts plausibly support a claim for relief. Schatz, 669 F.3d at 55. Plausibility requires more than a showing of possibility; it is a context-sensitive inquiry that demands reliance on this Court's judicial experience and common sense. Id. (*citing* Iqbal, 556 U.S. at 678-79).

11 | Civil No. 22-1190 (GMM)

Put differently, the complaint must provide sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" of the necessary elements. Twombly, 550 U.S. at 556. Sufficiency is not a question of quantity, but quality. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the Court must dismiss the complaint, as the party has only "alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); Douglas v. Hirshon, 63 F.4th 49, 55 (1st Cir. 2023).

If the federal claims fail to sustain this Court's jurisdiction, review of supplemental state claims become discretionary and may fall as well. 28 U.S.C. § 1367(c); see also Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996).

Fraud claims also trigger stricter review of pleadings under Federal Rule of Civil Procedure 9. The Section 10(b) claim is governed by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"), which imposes a "heightened pleading standard . . . to 'curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.'" Ponsa-Rabell v. Santander Secs. LLC., 35 F.4th 26, 32 (1st Cir. 2022) (quoting In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 29-30 (1st Cir. 2012)). So too for the Racketeer Influenced and

**12 | Civil No. 22-1190 (GMM)**

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, claim: "[A] greater level of specificity is required in RICO cases." Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 443 (1st Cir. 2000); Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997) ("It is not enough for a plaintiff to file a RICO action, chant the statutory mantra, and leave the identification of predicate acts to the time of trial."). Therefore, the fraud alleged under these claims must be pled with particularity, including the "time, place, and content" of the falsehoods. New Engl. Data Svcs. v. Becher, 829 F.2d 286, 288 (1st Cir. 1987); Fed. R. Civ. P. 9(b).

### V.    LEGAL ANALYSIS

Plaintiffs assert three federal causes of action: a claim for declaratory relief; a securities fraud claim under Rule 10b-5 of the Securities and Exchange Act, alleging that certain Defendants made material misrepresentations in connection with the purchase of his ownership interest in the project entities; and civil claims under RICO, alleging that several Defendants participated in a pattern of racketeering activity involving, amongst other alleged misconduct, mail fraud and wire fraud. Plaintiffs contend that the alleged misuse of project funds, the submission of fraudulent drawdown requests, and the concealment of financial information from investors and lenders constituted predicate acts supporting a RICO enterprise.

The Court addresses each in turn.

13 | Civil No. 22-1190 (GMM)

A.    Declaratory Judgment

Boyd and Lassers' first seek a declaration under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, that they did not misappropriate trade secrets belonging to BGF and therefore would not be liable under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, if such claims were brought against them. (Docket No. 147 ¶¶ 667, 671).

The DJA, however, does not itself confer subject matter jurisdiction. In re Fin. Oversight & Mgmt. Bd. for P.R., 919 F.3d 638, 645 (1st Cir. 2019). Rather, it provides a remedy where an independent basis for federal jurisdiction exists. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–74 (1950).

Federal courts may grant declaratory relief only where an "actual controversy" exists between the parties. 28 U.S.C. § 2201, and not simply a "hypothetical state of facts." Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 241 (1937).

At the outset, there is no actual controversy here as the Lópezes are not even party to this suit anymore. See (Docket Nos. 701, 712, 720). Regardless, Plaintiffs do not allege that any current Defendant has filed or threatened a trade secret claim against them. Instead, they request a declaration concerning a hypothetical lawsuit that might be brought in the future by the Lópezes. But federal courts cannot issue advisory opinions, Igartua-de la Rosa v. United States, 417 F.3d 145, 153 (1st Cir.

**14 | Civil No. 22-1190 (GMM)**

2005), and jurisdiction cannot rest on an actual or anticipated defense. <u>Vaden v. Discover Bank</u>, 556 U.S. 49, 60 (2009).

To the extent that Plaintiffs have not alleged facts demonstrating a concrete and immediate controversy concerning trade secrets liability, their request for declaratory relief fails to present a justiciable case or controversy. Speculative or subjective apprehension of future litigation, without concrete actions or threats by an opposing party, is insufficient to establish the immediacy required for Article III jurisdiction.

The declaratory judgment claim must therefore be dismissed.[10]

B.    <u>Securities Rule 10b-5</u>

Boyd and Lassers also assert a securities fraud claim under Section 10(b) of the Securities Exchange Act and Rule 10b-5 against López-Vidal for misrepresenting the source of funds used to purchase Boyd's interest, (Docket No. 147 ¶¶ 3, 144, 698-702), and against Banco Popular and Rodríguez for knowledge and facilitation of this misrepresentation. (<u>Id.</u>).

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of any manipulative or deceptive device in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). SEC Rule

---

[10] Notably, in 2022 Magistrate Judge McGivern warned Plaintiffs of the failures with this argument in his *Report and Recommendation*. *See* (Docket No. 74 at 9-10). Moreover, any trade secrets claim would be time-barred. *See* 18 U.S.C. § 1836(d). Nevertheless, six months later, Plaintiffs continued to plead this preemptive cause of action, (Docket No. 147 ¶¶ 666-71), and did not remove it despite explicit acknowledgement of these conditions. (Docket No. 715 at 11).

10b-5, in turn, makes it unlawful to make material misstatements or omissions or otherwise engage in conduct that operates as a fraud upon investors. 17 C.F.R. § 240.10b-5(b). Rule 10b-5 is "coextensive with the coverage of Section 10(b)." Ponsa-Rabell, 35 F.4th at 32 (*quoting* Sec. & Exch. Comm'n v. Zandford, 535 U.S. 813, 816 n.1 (2002)).

To state a claim under Rule 10b-5, a plaintiff must plead six elements: "(1) a material misrepresentation or omission; (2) scienter [legal speak for knowledge]; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017) (*citing* Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015)).

Private plaintiffs can only bring suit under Rule 10b-5 against primary violators, not aiders and abettors or secondary violations. Sec. & Exch. Comm'n v. Tambone, 597 F.3d 436, 445-46 (1st Cir. 2010). Furthermore, prosecution of aiders and abettors can only be done by the Securities and Exchange Commission ("SEC"). Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 158 (2008) (*citing* 15 U.S.C. § 78t(e)).

To the extent that the Lópezes are no longer parties to this action, the Court only addresses the claim as to Banco Popular and Rodríguez.

**16 | Civil No. 22-1190 (GMM)**

Even assuming the alleged misrepresentations occurred, the claim fails for a threshold reason: Banco Popular and Rodríguez are not alleged to be primary violators in the MIPA transaction. In fact, they are frequently described as "aiding and abetting that fraud," (id. at 35), by facilitating transactions. *See* (id. ¶¶ 35, 169, 172, 701, 704). The *Second Amended Complaint* repeatedly emphasizes that it was López-Vidal who paid Boyd for the sale of his common ownership (id. ¶¶ 3, 172, 701). Thus, only the SEC – not Boyd and/or Lassers – is authorized to bring claims against aiders and abettors.

Because the *Second Amended Complaint* fails to plausibly allege a securities transaction within the scope of Section 10(b), the Rule 10b-5 claim must be dismissed.

C. RICO

The Court turns its attention now to the last claim that could provide Boyd and Lassers with the requisite federal jurisdiction: RICO. The *Second Amended Complaint* alleges that, apart from the activity of the Lópezes, the remaining Defendants have committed their own RICO violations in pursuit of financially benefitting from the biorefinery project.[11] Specifically, the *Second Amended*

---

[11] At different times in the *Second Amended Complaint*, Plaintiffs describe the purpose of this RICO pursuit in opposing and competing directions: either for the Defendants to enrich themselves from the revenue that would come from the success of the biorefinery and obtaining gas rights agreement, (Docket No. 147 at 20, 84), or to profit from the demise of the biorefinery. (Id. at 144 ¶¶ 96, 555, 693).

17 | Civil No. 22-1190 (GMM)

*Complaint* places Banco Popular at the center of the RICO enterprise, contending that it and Rodríguez knowingly disbursed loan money based on drawdown certificates it knew to be fraudulent, thereby engaging in bank fraud to defraud itself, and conspired to allow the Lópezes to amend the Credit Agreement so Banco Popular could gain further control over gas offtake. (Id. at 20). Economou, as BGF's CFO, allegedly facilitated the accounting of these fraudulent drawdown certificates and made fraudulent representations by drafting López-Vidal's communications to investors, the Board, and banks. (Id.); *see also* (id. ¶ 683). Acosta allegedly provided credit via ASC to obtain the Banco Popular loan and profit under ITS/ASC JV. (Id. at 20, 142 ¶ 690). Borschow is alleged to have participated in the Lópezes and BGF/GFC's decisions by way of eliminating corporate controls, failing to provide more oversight, and facilitating the purportedly false drawdowns – all to allow the loans to be "swindled" by the Lópezes and Economou. (Id. at 20, 142 ¶ 683). Semillero, CDVCA, and PRFG are alleged to have supported Borschow in his actions. *See also* (id. at 141-44).

Plaintiffs' theory of the alleged purpose is internally inconsistent, alternately asserting that Defendants sought to profit from the project's success and from its failure. *See* (id. ¶¶ 96, 239, 480, 646-47). Such contradictory allegations further

**18 | Civil No. 22-1190 (GMM)**

undermine the plausibility of a coherent RICO enterprise or common unlawful purpose.

Collectively, Plaintiffs allege that these actions slot into different predicate acts under RICO, including: 18 U.S.C. § 1341, fraud; 18 U.S.C. § 1343, wire fraud; 18 U.S.C. § 1344, bank fraud; 18 U.S.C. § 1952, "travels in foreign commerce to distribute the proceeds of illegal activity"; 18 U.S.C. § 1957, money laundering; 18 U.S.C. § 2314, transporting stolen property over $5,000; and 18 U.S.C. § 2315, receipt of stolen money that crossed national borders. (Id. ¶ 674).

Several *Motions to Dismiss* challenge Boyd and Lassers' RICO standing. *See* (Docket Nos. 651 at 5-7; 652 at 5-14; 654 at 4-5; 655 at 5-12; 657 at 22-32). As standing is a threshold matter, the Court begins by addressing this issue.

At the outset, it is indispensable to address the applicable pleading standards. As Magistrate Judge McGiverin identified early on, Plaintiffs' allegations "make sweeping statements about fraud but fail to plea fraud with particularity." (Docket No. 74 at 10-11). This remains true when it comes to the *Second Amended Complaint*: Plaintiffs often make nominal, vague, and conclusory statements about the involvement of each RICO Defendant, their connection to a predicate act, and the time, place, and manner of such actions. *See generally* (Docket No. 174). For instance, based

**19 | Civil No. 22-1190 (GMM)**

on the *Second Amended Complaint*, the Court cannot tie CDVCA and PRFG to any of the alleged injuries.[12]

This approach is incompatible with Rule 9(b), which requires that each defendant be apprised of the specific fraudulent conduct attributed to them. These issues only compound the further the Court delves into the RICO allegations, in violation of Rule 9's pleading requirements.

    a. Standing under RICO

The RICO statute prohibits those "associated with any enterprise" operating in interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964 provides a civil cause of action for those injured "by reason of" Section 1962 violations. Id. § 1964. The underlying section 1962 violation in turn requires demonstrating: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). The statute separately defines

---

[12] Plaintiffs argue the *Second Amended Complaint* adequately alleges that CDVCA and PRFG's actions were a proximate cause of Plaintiffs' injuries. *See* (Docket No. 717 at 10). They claim that by amending the operating agreement to give the Lópezes "free reign," (Docket No. 147 ¶ 65), failing to oversee drawdowns (id. ¶¶ 116-18) and approving self-interested investments (id. ¶¶ 544-49), CDVCA and PRFG enabled predicate acts such as wire fraud under 18 U.S.C. § 1343, bank fraud under 18 U.S.C. § 1344, and money laundering under 18 U.S.C. § 1957, leading to dilution of Plaintiffs' shares, and increased financial exposure for Boyd. (Id.). Plaintiffs' response, however, implicitly acknowledges that none of the alleged predicate acts were in fact not committed by CVDCA or PRFG. Therefore, under Hemi Grp., LLC v. City of New York – as further discussed *infra* - no RICO claims can lie against CDVCA or PRFG. 559 U.S. 1, 13 (2010).

**20 | Civil No. 22-1190 (GMM)**

"pattern of racketeering activity" to require "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). The PSLRA bars suit under RICO for securities-related fraud. 15 U.S.C. 78u-4.

To have standing to assert a civil claim under RICO, a plaintiff must make the threshold showing that they (1) suffered an injury to their business or property, and (2) that the defendant's violation of Section 1962 both proximately caused and was the but-for cause of that injury. *See* 18 U.S.C. § 1964(c); Lerner v. Colman, 26 F.4th 71, 77 (1st Cir. 2022); Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd., 990 F.3d 31, 35 (1st Cir. 2021).

Not every injury is cognizable. Injuries cannot be hypothetical or based on mere speculation. DeMauro v. DeMauro, 115 F.3d 94, 97 (1st Cir. 1997); *see* First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994), cert. denied, 513 U.S. 1079 (1995) ("[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite."). There must be proof of a concrete economic or financial loss to one's business or property. In re: Celexa and Lexapro Mktg. & Sales Pracs. Litig., 915 F.3d 1, 8 (1st Cir. 2019). Plaintiffs may only recover as individuals for injuries sustained that are "peculiar to [each of them] alone and do[] not fall alike upon other stockholders." *See* Efron v. Embassy Suites (P.R.), Inc.,

47 F. Supp. 2d 200, 207-08 (D.P.R. 1999) (*citing* Roeder v. Alpha Indus., Inc., 814 F.2d 22, 29 (1st Cir. 1987)).

Under Section 1962(a), the alleged "injury resulting from the investment of racketeering income" must be "distinct from an injury caused by the predicate acts themselves." Compagnie De Reassurance D'Ile de France v. New Engl. Reinsurance Corp., 57 F.3d 56, 91 (1st Cir. 1995) (citation modified). Likewise, Section 1962(b) requires proof of harm "beyond that resulting from the fraud which constituted the predicate act." Id. at 92. "It is not enough for a plaintiff to allege an injury caused by defendants' predicate acts of racketeering." P.R. Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriquena, Inc., 118 F. Supp. 3d 447, 459 (D.P.R. 2015). Under Section 1962(c), the compensable injury is the harm caused by the predicate acts committed by that particular defendant. Hemi Grp., LLC v. City of New York, 559 U.S. 1, 13 (2010). Similarly, in a Section 1962(d) RICO conspiracy claim, the alleged injury must flow from an overt act that is itself an act of racketeering or otherwise unlawful under the RICO statute. Beck v. Prupis, 529 U.S. 494, 507 (2000).

The First Circuit has identified "three functional factors with which to assess whether proximate cause exists under RICO." In re Neurontin Mktg. & Sales Pracs. Litig., 712 F.3d 21, 35-36 (1st Cir. 2013) (*citing* Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 269-70 (1992)). These include (1) "concerns about proof"

because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors," id. at 36 (quoting Holmes, 503 U.S. at 269); (2) "concerns about administrability and the avoidance of multiple recoveries," id.; and (3) "the societal interest in deterring illegal conduct and whether that interest would be served in a particular case." Id. As to this third factor, "directly injured victims can generally be counted on to vindicate the law . . . without any of the problems attendant upon suits by plaintiffs injured more remotely." Id. (quoting Holmes, 503 U.S. at 269-70).

Critically, proximate cause under RICO requires more than allegations that a defendant's conduct was a "link in the chain" of events leading to injury. Under any subpart of RICO, the causal link between injury and harm must be direct; proximate and but-for causation must exist. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006). The Supreme Court has rejected liability where the causal theory depends on intervening actors or attenuated inferences. See Hemi Grp., 559 U.S. at 9; Anza, 547 U.S. at 458-60. The central inquiry is whether there is a sufficiently direct relationship between the alleged predicate acts and the plaintiff's injury. Thus, allegations that defendants merely "facilitated," "enabled," or "failed to prevent" misconduct, without such a direct relationship, are insufficient as a matter

**23 | Civil No. 22-1190 (GMM)**

of law. If a plaintiff cannot make a sufficient showing – either derivatively or individually - the claim must be dismissed for lack of standing. *See* Sterling, 990 F.3d at 37.

### i. Derivative Standing

Start first with derivative injuries. Plaintiffs contend that the RICO Defendants' conduct reduced the value of BGF/GFC, thereby harming the companies. Thus, Boyd and Lassers seek to pursue those claims derivatively. (Docket No. 147 at 19).

But Boyd and Lassers cannot sue on BGF/GFC's behalf. Federal Rule of Civil Procedure 23.1 sets forth the requirements of a derivative suit. In relevant part, it must (1) be verified, and (2) "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law," and (3) state "with particularity" the efforts to obtain the desired outcome from directors. Fed. R. Civ. P. 23.1. Plaintiffs' position as shareholders or members at the time of the *Second Amended Complaint* filing isn't meaningfully contested. However, Plaintiffs admit that they fail at the second step: the *Second Amended Complaint* is not verified. *See* (Docket No. 710 at 8). As such, the derivative standing attempt falls on this requirement alone.

The Court could stop there. But the formality of verification was not Plaintiffs' singular error. The *Second Amended Complaint* also fails to comply with the requirements of Rule 23.1 by not

**24 | Civil No. 22-1190 (GMM)**

stating with particularity the efforts Boyd and Lassers took to make a pre-suit demand on the BGF/GFC board before attempting to sue derivatively, or why making such demand would have been futile.

Futility is a strict requirement that the First Circuit vigorously guards; pleading "in general terms, hoping that, by discovery or otherwise, [Plaintiffs] can later establish a case" is insufficient. González Turul v. Rogatol Dist., Inc., 951 F.2d 1, 2-3 (1st Cir. 1991); *see also* In re First Bancorp Derivative Litig., 465 F. Supp. 2d 112, 115 (D.P.R. 2006) (requiring plaintiffs to claim more than wrongdoing, especially when directors are presumed to act in good faith). This is because a "shareholder derivative action is an action of last resort." González Turul, 951 F.2d at 2.

Plaintiffs state that they "have brought the conflicts of interests and mismanagement to the Boards of BGF and GFC, which are dominated and controlled by Defendants and have been rejected, or worse, falsely accused of stealing trade secrets and removed from the Board." (Docket No. 147 ¶ 755). These allegations are not only broad, but they are also devoid of the time, place, manner, and content of any of these alleged pre-suit demands. Plaintiffs further state that "[a]ny further attempts to remedy the flaws detailed in this pleading would be futile because the directors of BGF and GFC are not impartial, in fact, they are partial to the conflicts of interest, mismanagement, and fraud." (Id. ¶ 756). The

Court, however, cannot overlook flaws in the pleading that contravene the Federal Rules of Civil Procedure simply because a party urges it to do so.

On top of this, the *Second Amended Complaint* lacks a statement that affirms Boyd and Lassers are adequate representatives of the other owners' interest. *See* (Docket No. 6455 at 11-12). In fact, the opposite has been the case: this Court has already determined and ordered at Docket No. 123 that BGF and GFC were to be realigned as Defendants. Both companies then moved to dismiss the derivative claims at Docket Nos. 659 and 740. Therefore, stylizing these injuries as derivative would be inappropriate.

Nor can Boyd and Lassers dress up derivative harms as individual ones. Any alleged harm in the form of diminished value of Plaintiffs' membership interests in BGF/GFC due to the Defendants' conduct may not be brought individually by Plaintiffs because a claim for loss of value belongs to the company itself. *See* (Docket Nos. 652 at 6-7; 657 at 25-26, 56). "A suit under RICO for injuries to the corporation . . . can only be brought by the corporation itself or by a shareholder suing derivatively on behalf of the corporation." Roeder v. Alpha Industries, Inc., 814 F.2d 22, 29 (1st Cir. 1987); *see also* Pagán v. Calderón, 448 F.3d 16, 28 (1st Cir. 2006) ("In terms of standing, this separateness has led to the tenet that '[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a

**26 | Civil No. 22-1190 (GMM)**

stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock.'") (internal citation omitted).

Similarly, any alleged injury stemming from the project delays or damage to equipment at the biorefinery site would be injuries suffered by all members alike because any financial losses would be directly borne by BGF/GFC. Any harm that may be identifiable to Plaintiffs as individual would not be "peculiar to him alone" but applicable to them only by virtue of their ownership interest in BGF/GFC. *See* Roeder, 814 F.2d at 30; *see also* Bass v. Campagnone, 838 F.2d 10, 12-13 (1st Cir. 1988) (finding that "diminution of bargaining power," misapplication of funds, and loss of competitive advantage were "injuries sustained by the local union," thus plaintiffs' harms were not "peculiar" to them); Efron, 47 F. Supp. 2d at 208 ("[A] RICO action to recover for injury to the [company] is an asset of the [company] that [members] may not bring in their own names.") (*citing* Roeder, 814 F.2d at 30).

Thus, BGF/GFC's diminished value cannot be cognizable as an injury either derivatively or individually for either Boyd or Lassers.

### ii.  *Individual RICO Standing*

Boyd and Lassers levy other individualized harms to support their standing. These include: the loss of Lassers' SAFE note;

**27 | Civil No. 22-1190 (GMM)**

Boyd's exposure as a guarantor in the Credit Agreements; Boyd's decreased ownership interest; and Boyd's lost seat on the BGF/GFC's Board of Directors through breach of the MIPA. (Docket No. 147 at 9). More broadly, Plaintiffs' alleged injuries are either derivative, speculative, or contingent on the actions of third parties, including the Lópezes. Such allegations do not constitute the concrete and direct injury required for RICO standing.

These injuries, the Court notes, are tied in the *Second Amended Complaint* largely to the securities and state claims. (Id. ¶¶ 698, 715, 745, 775). Yet both Plaintiffs and RICO Defendants in their responsive pleadings treat these injuries at times as interchangeable with the injuries required for RICO standing, likely because the *Second Amended Complaint*'s pleading made line-drawing a difficult exercise. *See, e.g.,* (Docket Nos. 657, 710, 711, 715, 718, 780, 782, 784, 796). In any event, none of these individualized injuries can support RICO standing.

As noted earlier, Plaintiffs provide only vague and conclusory allegations as to each RICO Defendant's involvement, their connection to a predicate act, and the time, place, and manner of the alleged conduct. Labeling a series of business disputes or alleged contractual breaches as "racketeering" does not transform them into RICO violations. Courts must be cautious not to allow ordinary commercial disagreements to be recast as federal racketeering claims.

28 | Civil No. 22-1190 (GMM)

Nevertheless, the Court below will attempt to sift Plaintiffs' well-pled allegations from the chaff and, where applicable, connect each cognizable injury to a purported perpetrator and RICO predicate act.

### a. Lassers' SAFE Note

Lassers flags only one injury peculiar to him: the loss of his SAFE Note. Importantly, the terms of Lassers' SAFE Note are never provided in the *Second Amended Complaint*. So the Court has no grounds to ascertain, based on the face of the pleadings alone, how much money is involved, whether Lasser's capital was converted into non-ownership equity, or what governs this note. As pled in the *Second Amended Complaint*, the most the Court is offered is that "[t]he Lópezes' falsified documentation, threats of litigation, and fraudulent payment for the MIPA with loan money designated for the biorefinery[, which] also caused the negation of Lassers' rights to ownership under his SAFE note agreement with BGF as part of the MIPA agreement." (Docket No 147 ¶ 178).

Relevant here are not the Lópezes who committed the alleged act, however, but the remaining RICO Defendants. Plaintiffs allege in broad strokes aided and abetted the Lópezes's actions in various ways related to the MIPA, but none of these allegations specifically address their involvement in the decision around Lassers' SAFE note. *See* (id. at 9). Banco Popular, Rodríguez, Borschow, Semillero, and Economou are merely tied to the SAFE note

because they allegedly facilitated and processed the purportedly fraudulent loan drawdowns and made other accounting errors. (Id. at 45-49).

Under the Hemi analysis, the Lassers' injury claim fails for two separate reasons. First, Plaintiffs' description of this injury is insufficient. "Injury to property is not an infinitely elastic concept." DeMauro v. DeMauro, 115 F.3d 94, 97 (1st Cir. 1997) (citation modified). "[I]n cases like this, it is hard to see how a court would calculate damages now, given the dual uncertainties" in assessing what the potential SAFE Note loss is and how involved RICO Defendants allegedly were in that loss. Id.; see also Lifevoxel Va. SPV, LLC v. Lifevoxel.Ai, Inc., No. 22-CV-1917, 2023 WL 6370635, at *9 (S.D. Cal. Sep. 15, 2023) (noting plaintiffs failed to demonstrate economic loss in the absence of facts showing that the value of the SAFE Note had been reduced or whether a conversion event to equity was possible).

Even if this were a cognizable injury, which the Court refrains from analyzing, Plaintiffs fail to plead with particularity under the PSLRA and Rule 9(b) to demonstrate that the remaining Defendants have sufficient ties to the action to satisfy causation. Only the Lópezes are directly tethered to the allegedly negation of Lassers' SAFE note and ownership. (Docket No. 147 at 20). Since "[t]he chain" of causality "cannot be wholly based on actions of third parties or require too many steps to

**30 | Civil No. 22-1190 (GMM)**

connect" the remaining RICO Defendants "to the claimed injuries." Sterling, 990 F.3d at 35, Plaintiffs fail to meet the causation requirement for standing as to Lassers' SAFE note.

### b. Boyd's Guarantor Status

Framing Boyd's guarantor status as an injury is similarly unavailing. Boyd alleges that the second, third, fourth, and fifth amendments to the Credit Agreement locked him in as a guarantor without his consent or signature, and that he is a guarantor of the NMTCs which he alleges were fraudulently misused. (Docket No. 147 at 26, 83). Of the RICO Defendants, Boyd chalks up Banco Popular, Rodríguez, Economou, Borschow, Acosta, and Semillero's participation – or lack of action - in allowing alleged fraud as constituting wire fraud and bank fraud. (Id. at 3, 31, 35, 83-86, 95, 127, 129, 130-32, 143).

This too is a derivative injury marionetting as an individual harm. "Guarantors, like creditors, may not recover directly against a lender for injury inflicted on the firm; they 'must take their place in line as creditors in the bankruptcy action . . . dependent now as before on the success of the firm in which they invested.'" Wetherbee v. N. Middlesex Sav. Bank, No. 90-CV-13111, 1993 WL 62363, at *1 (D. Mass. Feb. 16, 1993) (*quoting* Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d 1333, 1336-37 (7th Cir. 1989)). The injury here - were Boyd's guarantor status made

relevant – would be to BGF/GFC for going into default, and not directly to Boyd.

This point has already been thoroughly examined in this District in a case with similar parties, bringing similar claims. *See* Boyd v. Banco Popular de P.R., No. 24-CV-1569-PAD, 2025 WL 3705209, at *9-12 (D.P.R. Dec. 22, 2025) (discussing how Boyd's guarantor status fails to state an injury peculiar to him as opposed to BGF/GFC that could provide standing under the anti-tying act). This Court agrees with this analysis as also pertaining to the RICO claim and adopts it herein.

### c. Boyd's Ownership Interest

Relatedly, Boyd also raises his decreased ownership interest in BGF/GFC as an individual harm. In the *Second Amended Complaint*, Plaintiffs allege that in violation of Sections 1962(a) and (b), "Olmar López Vidal took money derived from bank fraud to invest in BGF by buying part of Boyd's ownership in BGF with money from the bank loan to get a controlling interest in the enterprise." (Docket. No 147 ¶ 676). They further allege that "Banco Popular and Joval Rodríguez conspired with López Vidal to get this done." (Id.). Semillero, PRFG, CDVA, Economou, and Borschow also allegedly facilitated and benefitted from the Lópezes' actions to decrease Boyd's ownership. (Id. at 47, 84-85, 118).

This fails to identify what economic injury Boyd suffered. Boyd sold 7.5% of his ownership shares through the MIPA and

**32 | Civil No. 22-1190 (GMM)**

received financial compensation in return. (Id. ¶¶ 170-72, 698). Boyd's only gripe is where the money came from. *See* (id.). In other words, Boyd has not identified any economic circumstance that would materially change as to his business or property were López-Vidal to have paid him with personal funds. This allegation lacks the clear and definite damages, or any financial loss whatsoever peculiar to Boyd, that RICO standing demands. *See* In re: Celexa, 915 F.3d at 8; First Nationwide Bank, 27 F.3d at 768.

Even if there were identifiable financial harm here, it would be harm done unto BGF/GFC for allegedly using company funds incorrectly, not harm unto Boyd as a mere member of BGF/GFC. This would then be another derivative harm, which would fail for the same reasons stated *supra*.

### d. Boyd's Board Seat

Lastly, Boyd raises his lost board seat as an injury to confer RICO standing. Boyd alleges that the allegedly fraudulent MIPA agreement – which he entered into with the Lópezes - promised him a BGF Board seat and paid position as Chief Operating Officer that he was never given. (Docket No. 147 at 145, 153). This loss was allegedly facilitated by most of the RICO Defendants: Banco Popular by allowing money to be wired to support this alleged fraud; Borschow for not performing adequate checks on the Board and funds the Lópezes used; Semillero for not performing adequate checks on Borschow; Economou for approving the fraudulent drawdowns; and

**33 | Civil No. 22-1190 (GMM)**

CDVCA and PRFG for supporting Borschow "in all efforts to suppress the truth." (Id. at 140-45).

As Plaintiff notes, losing a job could be a cognizable injury under RICO. Med. Marijuana, Inc. v. Horn, 604 U.S. 593, 612 (2025) (holding that a loss of job after plaintiff unwittingly consumed THC can constitute an injury under RICO); *see also* (Docket No. 718 at 24 n.3). And Boyd does plead that the Board position he was allegedly owed was paid, likening it to a lost job.[13] (Docket No. 147 at 153). Even assuming, without deciding, that this Supreme Court holding may apply, Boyd has still insufficiently alleged that the above-mentioned RICO Defendants directly and proximately caused this loss.

Sterling is instructive here. Relying on Hemi, the First Circuit in Sterling emphasized RICO's direct relationship requirement, and the need for conduct and injury – here being a lost Board seat and lost income – to rise above a "purely contingent" relationship. 900 F. 3d at 35-36. There, the First Circuit was unable to identify a sufficient connection Sterling's lost income were he to have been granted a lease from Mohegan - with whom Sterling had made a contract - and Wynn's concealment of

---

[13] The Court notes, however, that Boyd also pleads that he was in fact given a paid job position at BGF/GFC in the form of a New Business and Development Director, making it unclear whether the injury of a lost job or lost income is actually on point. (Docket No. 147 ¶¶ 185-88).

**34 | Civil No. 22-1190 (GMM)**

records, fraudulent misrepresentations, and alleged kickbacks – with whom Sterling did not have a contract. Id. at 36-37.

The same is true for Boyd. Boyd's agreement under the MIPA was with the Lópezes. All other activities conducted by the other RICO Defendants – purported concealments, misrepresentations, fraud - are contingent on the contract with the Lópezes that promised Boyd this Board seat and failed to carry out their end of the bargain. Thus, Boyd's lost Board seat is only directly related to the Lópezes and cannot rise above pure contingency as to the remaining Defendants to meet RICO's strict causality requirements.

### D. Substantive RICO Claims

As Plaintiffs have failed to make the threshold showing for standing, the Court needs not delve into the sufficiency of the substantive RICO claims under 1962(a), (b), and (c). The deficiencies identified above are not merely technical pleading defects but reflect a fundamental failure to connect specific Defendants, specific predicate acts, and concrete injuries through a direct causal chain, as required under RICO.

### E. State Claims

Without federal claims, this Court will not extend supplemental jurisdiction over the remaining seven state claim counts. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."

**35 | Civil No. 22-1190 (GMM)**

United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); *see also* Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998). This is particularly appropriate where, as here, the federal claims are dismissed at an early stage, and the remaining claims raise issues better addressed by local courts.

### VI.    CONCLUSION

Ultimately, despite the breadth and seriousness of the allegations, the *Second Amended Complaint* fails to bridge the gap between alleged misconduct and legally cognizable federal claims. As such, the Court hereby **GRANTS** the *Motions to Dismiss*. Accordingly, the Court DISMISSES all federal claims with prejudice and DISMISSES the remaining state law claims without prejudice. All other pending motions are deemed moot. Judgment shall be entered accordingly.


IT IS SO ORDERED.

In San Juan, Puerto Rico, March 18, 2026.


/s/ Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
United States District Judge